Mr. Summerfield, whenever you're ready. Thank you, your honor. May it please the court. The matter below was resolved by summary judgment, and it is our contention on appeal that that summary judgment was issued in violation. You should have gotten 10 days. You didn't get a chance. We didn't get a chance at all, your honor. Like two hours. It was a matter of a few hours, and the. That's not sufficient time. Well, the Powell case pretty much says it's not, right? And we're bound by the law of the regional circuit. That's correct, your honor. And in fin controls, this court also says that where you don't have any notice that you're going to be subject to a summary judgment against you, that that is per se insufficient. And the case should be remanded. And the reason went on your claim construction argument. You're going to knock this out anyhow, right? That's correct, your honor. So we do argue alternative grounds, but I want to point out the principal. We were saying on the on the on the claim construction issue, in fact, in point of fact, your honor, it really doesn't matter. We have evidence of infringement under both constructions. So the district court or the federal circuit need not even address these constructions. You're focusing exclusively on randomly, right? That's correct. Just want to make sure, because you've got an awful lot of constructions in this case that have been appealed and just summarized very briefly, because obviously those issues are aligned in our brief. You might not want to spend your time summarizing, and you might just want to go to the heart of the ones that are most important to you. Well, actually, your honor, my goal today was to exclusively deal with the randomly issue, because that is the one issue on which Collins was denied the ability to go to trial. We were prepared to go to trial on the five limitations the district court did originally construe back in October 14th of 2005. And again, just by way of background, Southwestern Bell had essentially asked the district court to construe virtually every claim limitation of every claim being asserted against them below. The district court issued its claim construction in October 2005 and said, I will construe these five claim limitations. And then the district court concluded by saying, all relief not expressly granted herein is otherwise denied. Now, at that time, Southwestern Bell opted not to ask the court for reconsideration, saying, no, no, wait a minute, you have to construe these other limitations, because we have arguments on all of them. Rather, they waited until their pretrial briefs were due a year and a half later and filed a motion saying, we want you to construe a couple additional limitations, including randomly. And you're not saying procedurally that was wrong. I mean, the court construed randomly, what, a month in advance of the trial date? I mean, there's no problem with that, is there? No, Your Honor. Actually, the district court construed the randomly limitation at the pretrial conference, which was basically the Friday before the Monday the trial was scheduled to start. At the end of the first part of the pretrial conference, the court handed out its decision on the randomly limitation. Haven't we have claim constructions come down on the eve of trial, and we've blessed them 20 times over, saying that it's not up to us to dictate how district courts conduct the process of their trial? That's absolutely true, Your Honor. And in fact, if the district court had said, here's how I'm going to handle this. I am going to wait until trial, and I'm going to issue claim constructions on the limitations that I think matter. Does the district court have to tell you how they're going to handle it? We think so, Your Honor. Of course not, they can just let it ride. Your Honor, that's the problem. Because if the district court says, I'm not going to tell you what I'm going to do, and even worse in this case, here's what I've done and all other relief is denied in 2005, and then in 2007. Our case law thus far has not held that if you're so blindsided as you would say you were, that that's reversible error. The case law thus far has presumed that if a trial judge is going to perform as this trial judge did, then you better be arguing the alternative right up until you finally learn what's going on. And I realize from your perspective why that's not as favorable as knowing in the beginning which way you're going. It goes beyond unfavorable, Your Honor. It turns claim construction and infringement into a game of judicial whack-a-mole. No, counsel, it's not like this judge construed randomly in your favor, you built a whole case on it, and then he construed it the other way, which by the way, I don't see anything wrong with that either. I want them to reconsider. If after more considered thought they come to the conclusion they're wrong, better they figure it out than we have to tell them. So that's a good thing. But in this case, he didn't give any construction of randomly, so you should have been introducing evidence every which way on randomly, because going up to trial, you had no idea how it should be construed. He had not given any indication up until that point. How were you prejudiced? Actually, that's not correct, Your Honor. The judge did give indication that she wasn't going to decide anything else when in her original construction she said, all of the relief not hearing issued is denied. I.e., I'm not going to construe any of the other terms at this time. How does that give you any indication as to how she thought the word randomly should be construed? Because it tells us that I've looked at these claim limitations. I've looked at all of them. I have the briefs. I see that Southwestern Bell wants me to construe everything. These are the ones I'm going to construe, and everything else is denied. Didn't you put forth your construction of randomly? I mean, I read the appendices in the briefing, and it seems to me that this issue was fully and thoroughly briefed by both sides. At the claim construction stage, and that's absolutely correct. Right, so she said, I'm going to not decide it now. And then later on, she realizes, wait, I really do have to decide this. There are issues here. I can't just throw this to the jury because the Federal Circuit has said I have to resolve claim construction. And so she goes back and tends to it. I don't blame her in the first instance to not construe 100 different terms in 20 different claims. I mean, do you? I mean, who would want to do that? Why not wait until the process gets a little further and figure out which ones are really in dispute? Because that was the whole purpose of claim construction. That was one of the things she asked the claim construction hearing, which of these really matter? And I understand what the court's saying. And obviously, district courts should have broad discretion in how it handles the issue of claim construction. But where you have a party going to trial with at least, in our opinion, a fairly good indication that these are the constructions that I'm going to worry about, the rest of them are not going to be relevant here, like the Northern District of California has done with its March 1 rules, saying the parties can dispute whatever they want as far as claim construction is concerned. But we're only going to construe 10 claim limitations, and that's it. So in essence, what we reasonably believed was she was, in essence, adopting that procedure for this case. Here are the ones I think are really meaningful. I'm not going to worry about these other ones. And if she'd said- Aside from the procedural point, how is she wrong in the construction of random? Your Honor- Getting to the meat of the matter. Very- well, actually, it's not- the meat of the matter, for summary judgment purposes, is whether she construed randomly correctly and whether she used the proper procedure for construing that randomly. I understand that, but let's get to the construction of the term, because you have very little time to present anything else. Your Honor, in essence, what we contend is the claims very clearly talk about randomly receiving and randomly transmitting data at the inlet and outlet ports of the TST switch. That's what the claims clearly call for. And in this court, construing the same claims in a prior litigation between Collins and Nortel made it very clear that the inlet and outlet ports and their respective memories are distinct structures. So although the claims only say that the inlet and outlet ports randomly receive and transmit data respectively, what the district court then did was say, well, in this case, randomly is going to refer to how that data is read into the memories of the inlet and outlet ports. In other words, she construed randomly as pertaining to a function that is not specified in the claims at all. She said that unless- irrespective of how that data shows up at the inlet port, irrespective of how that data is transmitted out of the outlet port, once it gets there and before it goes back out, you have to randomize that data into positions of an internal memory. Was she partly correct? Is it possible that that, what she said about random is correct, but didn't go far enough? It narrowed? It may very well be that that is a way to randomize data. But there's nothing in the claims that call for that level of detail as to what happens to the data once it is written into the memories. My point was that she'd given a broader definition and said this broader definition includes randomly reading into the memory. No, Your Honor, because again, it's focusing the randomization issue at the wrong point of the data transmission. In other words, what we contend should be the appropriate focus of the inquiry is how does that data arrive at the inlet port? How does it go out from the outlet port compared to the order of the data on the high-speed transmission medium before it's dropped to the TST switch or before it's added back into the high-speed transmission medium from the TST switch? And that has absolutely nothing to do with how that data is written into memory or read out of memory, whether it's random or sequential or something else. So you're saying it could arrive at the port in a random fashion, could then be rewritten into sequential, go through the system sequential, and then be rewritten to come out random? That's correct. And there's nothing in the claims that talk about how that particular read and write operation is to be done. It simply talks about the order of data at the inlet port and the order of data at the outlet port. Her construction focuses on a completely different set of operations, the rewrite operations. But I would like to turn, if I can, to the second issue of infringement in the summary judgment context, because I think this is particularly where Collins was wrong by violation of the procedural safeguards. We see that in her summary judgment motion, she granted summary judgment based on a single piece of evidence, and that was a quote from our expert, Dr. Wayne Grover. And the district court said, here is the testimony upon which I am relying, and she said that Dr. Grover testified that in the accused system, data is sequential. We know that the source of that quote that she relied upon is Southwestern Bell's brief that was submitted on the day that she ruled that there would be prosecution history estoppel, i.e. You're arguing there's a question of fact because he never says in the accused device, and in fact you say he's referring to sort of the patented invention. He is absolutely referring to claim one of the patent inventions. You're saying that creates a question of fact that should have barred summary judgment. Well, as a matter of fact, we're saying, yes, we're saying that not only is it a question of fact, but had we had the opportunity to do so, we could have put forth our own evidence that very clearly shows that data is written randomly into memory. I kind of want to go back to the randomly for a minute. Throughout the specification, the patent continuously bashes the notion of sequentially receiving channels repeatedly. I mean, you disclaim and disavow that up to the high heavens, so why wouldn't that sort of give us the context of understanding what you meant by randomly when you added it during prosecution history? I think it does, as long as we talk about where the randomization occurs. That is, in fact, the flavor of the invention. But when we talk about sequential in the specification, and in fact when we talk about it in the reexamination history, for example, we talk about sequential vis-a-vis the order that that data was in on the high-speed transmission medium. Because selected data is being dropped from the high-speed transmission medium. It is necessarily in an order different than the order in which it was on the high-speed transmission medium, and therefore it's randomized. So, Judge Moore, when you talk about the specification bashing sequential ordering of data, that's referring to the order of data appearing at the inlet port, for example, in exactly the same order it was in on the high-speed transmission medium. But it's not transmitted on a sequential basis, though. Not compared to the high-speed transmission medium, that's correct. And that is exactly how we contend the accused devices work. But, of course, again, we didn't have any opportunity to present evidence on that because we had no notice that summary judgment was pending. But, again, under the district court's... The 621 reference, which does it sequentially, what is it exactly they do sequentially? It's our contention... During prosecution. It's our contention that the channels themselves are transmitted in total from the high-speed transmission medium to the TST switch fabric. And that's true for innovation. It's true for all the pertinent prior art upon which Southwestern Bell relied. In other words, if you compared the channels of data now and their order at which they appear at the inlet port of a TST switch, that order is precisely the same as on the high-speed transmission medium. But is that a sequential? It would be... Minimized at that point. Well, it would be sequential in the sense that if channels 1, 2, 3, 4, 5 are transmitted along the high-speed transmission medium... Sequentially. They're dropped, yes, well, channels 1 through 7. They're dropped in total and then would appear at the inlet port in order 1, 2, 3, 4, 5, 6, 7. What about column 5 of your 589 patent, line 19? Column 5, line 19. Yes, Your Honor. It says, in accordance with the present invention, data is dynamically written randomly into the input memories and dynamically read randomly from the output memories. Why doesn't that give us the context? That does talk about how an embodiment of the invention works, Your Honor. The problem is you don't find that corresponding language in the claims. We've got to figure out what you were intending to do when you added the word random during prosecution to overcome the sequential nature of the 621 patent. That's correct. And throughout your spec, you distinguish between randomly and sequential. And it seems to me that at least in column 5, one of the things that you're focusing on is the randomness being into the input memory and reading out of. And that would sort of track exactly what the district court construed it as. But, again, the term she's interpreting from the claims now rather than the specification is the randomization of data at the inlet and outlet ports as opposed to the memories, which this court has said is separate. So it may very well be that the patent describes in more detail what the embodiment of the invention is. However, that still has to wend its way into the claim somewhere for the court to say I'm going to import that limitation from the specification into the claims. So we agree. That is clearly something that the embodiment would contemplate, but it's not in the claims. Mr. Summerfield, you're in your rebuttal time. Thank you, Your Honor. Three minutes for you. You have a lot of questions. Mr. Floyd. Please, the court. Adam Floyd on behalf of Southwestern Bell. I'd like to start by addressing this notice argument that they did not receive proper notice under Rule 56. On May 23, 2005, was when the Markman briefing occurred. The Southwestern Bell construction of randomly received was the construction that was ultimately adopted by the district court. So as of that date, they had notice to begin collecting evidence of infringement under our construction as well as under their own. And I think the next event is the key to unraveling this argument. On May 11th, 06, Southwestern Bell filed a motion for summary judgment of non-infringement. One of the bases set forth was the correct construction of randomly receiving. Is this your motion for summary judgment? Yes, Your Honor. It's at A-7485. Is where it starts. And randomly receiving is specifically addressed on A-7503. Is it a summary judgment vis-a-vis prosecution history estoppel, though, under the doctrine of equivalence? Or is it just focusing on claim construction? It focuses on claim construction. It says that they have no evidence of literal infringement and that they were stopped and that they're disclaimed. I didn't see anything in that that indicated that you were asking the court for summary judgment of no infringement under the doctrine of equivalence because of prosecution history estoppel. So if that's in there, you probably do want to direct me to it. On A-7486, the motion is entitled motion for summary judgment of no infringement. Yes, but where's your argument that prosecution history estoppel is the basis that you want the district court to conclude that summary judgment is appropriate? It's not in here. You're right, Your Honor. On A-7504, the argument we made was that they could not recover under the doctrine of equivalence. We cite both Festo and Deering. And I think that the argument there is both there's an estoppel and that they disclaimed or disavowed sequential. Well, you actually say your cite to Festo is such scope having been disclaimed in the specification cannot be recovered. You say nothing about prosecution history estoppel. So I don't see how that puts them on notice of the prosecution history estoppel that the court ultimately ruled upon. Your Honor, it certainly put them on notice that they had to come forward with their evidence of infringement. Your Honor, what rule 56 guards against, is it? I'm not sure I follow you. Rule 56, doesn't it? It's supposed to be, adverse parties are supposed to be aware of what your theory is so they can address the theory. You know, so the ships don't pass in the night in the briefing on the SJ. Well, the point is that if you say, oh, well, I think that we don't infringe on the doctrine of equivalence, but you don't say why, then I suppose the other side has to guess at what your theory is. The purpose of the notice is so you'll know precisely what ships are in the water so you can don't pass in the night. You have a nice collusion. Well, I think that we do at least provide notice that they cannot claim equivalence because it was disclaimed in the specification. Right, but as Judge Morris pointed out, the prosecution history estoppel festo style, which is what you got nailed for, doesn't deal with a disclaimer in the specification. It deals with a... Prosecution history. It deals with a failure to have shown tangentiality in essence in the file history. If there's a narrowing amendment, you presumptively lose everything between the original claim and the amended claim, and then the patentee gets a chance to call it back if you can. Why isn't your adversary correct on its interpretation of random? Well, I think... What specifically in the patent supports your theory that it's random deals with how it's read into the memory? Column 5, line 19 to 26. In accordance with the present invention, data is dynamically written randomly into input memories. That's column 5, line 19. That's the language that Judge Morris was discussing with Count Fletch Bell? Yes, Your Honor. Well, I think the argument from the patentee is that that may be an embodiment, but it doesn't limit the claim. He said we, in a previous case, have distinguished between memory and the inlet port. Well, but the... Is he right about our previous case? No, he's not. Just the contrary. AACI versus Nortel 216F3 at 1045. What this court held was, quote, Claim 1 of the 589 patent further requires each of the inlet and outlet ports to have a memory. The memory is part of the port. That's clear from the claim language itself. If you look at claim 1, it reads a plurality of inlet ports and a plurality of outlet ports, each having a memory. Would you also read column 5, line 48, as additional support for what we just talked about at column 5, line 19? Therefore, the order of writing to the inlet memory and reading the outlet memory is done in a random order? Yes, Your Honor. There's also column 9, line 62. The ability to randomly read and write to the switch memories provides for a new data traffic routing concept. Isn't that really a definition of standard RAM? It is the standard definition of RAM. Yes, Your Honor. Is that what we're supposed to follow and derive from the patent itself, or can we just use outside evidence to establish the fact that this is a standard RAM type of a random access to the memory? I think that what we're using, the accused devices, are standard RAM. A standard RAM is sequentially in, and then you randomly access or randomly read out. What's described in the patent is the reverse. You randomly write into memory positions, and then you sequentially read them out. It's just the opposite. Of your standard RAM approach? Yes, Your Honor. There's also support at column 3, line 34. Another aspect of the invention allows the order of writing to the inlet data store, data store being another phrase for memory. What about the 621 patent cited during prosecution? Because that's where the word random comes in to the claim. It didn't exist until the prosecution history, and in particular the rejection in light of 621. How would we use 621 to conclude that random means the writing in of memory, as opposed to the reaching of the lines like the patentee argues? 621 teaches a bypass, and according to their theory, what random means is you have, in our accused device, you have an ADM which accepts all the channels, and then it drops certain channels to the DCS, which under their theory is the TST switch. Let's assume that you receive 10 channels, and you drop just say the even number of channels to the DCS. Collins' theory is that's random because even though you're receiving them sequentially, 2, 4, 6, 8, 10, you've eliminated the odd channels, and therefore you've randomized the channels according to Collins' theory. The 621 has a bypass, and it sequentially reads... 1, 2, 3, 4, 5. Well, 2, 4, 6, 8, 10. The same as what we do, and therefore I think it's very significant that in view of the rejection of the 621, they then amended to add the word randomly before the word received. Vis-a-vis the random and sequential, you would say that your client's accused device is exactly like the 621 in that regard. In that regard, yes, and also the same is true for the book of innovation. It also has a bypass, and it receives sequentially, and throughout... Is it received sequentially instead of randomly at that point? It does receive sequentially. On the same basis? On the same. Yes, sir. Yes. So in the 621 at A7300, column 6, line 14, states that it reads sequentially into the memory, and then at column 4, line 19 to 28, it describes that the 621 has a bypass. And the distinction that Collins has made throughout the case over the 621 is that it receives sequentially, not randomly, even though it has that bypass in it. And so you can find that in their expert report of Dr. Grover, for example, at A5085. It's also reflected in the trial exhibits, which we exchanged prior to the claim construction, that the 621, they distinguish it as being sequential, not random, and that's at A9644-46. Under Collins' theory of what randomly receiving means, if you have a bypass present, you're randomly receiving, so you don't even need that language in the claim. The claim calls for a bypass. Under their definition, you bypass certain channels, and therefore you're randomly receiving. So it would read that limitation completely out of the claim. So the loop bypass would cause the sequential or the random? The loop bypass, let's say that you only send on, you bypass the odd channels and bypass, and you send on the even channels. You throw out certain channels. You throw out only some limited channels, right? Right. It doesn't have to be 1, 4, 5, or 6. It can be any channels that you select. Correct. So why is that not random? Well, because when you send them on, they're sent in sequential order. So if you send, let's say you select 1, 4, and 6, they arrive as 1, 4, and 6. You can't randomize the order and say... They're received in the same sequence that they're sent. Yes. Yes, Your Honor. And they can only be sent in sequential order. You can drop certain channels out, but you can't randomly access. You can't say channel 8, channel 2, then channel 4. And only send those. Right. You'd have to do 2, 4, 8. You've got a couple of other summary judgments in your favor, don't you? I'm sorry, Your Honor? Aren't there a couple of other summary judgments in your favor? Yes, Your Honor. You want to talk about them? The 1, 12, 6 issue?  Yes, Your Honor. Okay. I'm raising these other issues because the 907 was held invalid in toto because of indefinite failure to have had a structure that mates up with the means for measuring. Correct, Your Honor. And we've also got an invalidation of a patent because new claims were added and reexamined, supposedly for the wrong reason. Right, Your Honor. And I thought I'd just ask you to talk about those a little bit. So if the other party in rebuttal wanted to raise it, they could. Okay. Otherwise, he wouldn't be able to raise it. Okay. So you might want to decline to talk about it. Under the means for measuring. Not taking my hint, are you? Okay. No disclosure at all on the patent on structure for measuring? No, Your Honor. And more specifically, there's no linking language of measuring the timing adjustment interval. The passage that... We've never exactly said what linking language was. We have the requirement, but we've never told you what constitutes linking language. And we have sustained challenges to 126 claims where there wasn't a specific linking language saying, oh, when I said means for measuring, I mean this. Right? That's correct, Your Honor. As I understand the test, if one is to go to read the patent specification, they must be able to identify that that particular structure was intended to correspond to the recited function. Why isn't the counting measured? I think we have indicated clearly that there must be a link or associated structure with the claimed function. One of our cases in 2003, med instrumentation diagnostics versus electa, that's a clear indication that there must be a link. Yes, Your Honor. There must be a clear link or association between a structure shown and a recited function. So why isn't measuring counting? Counting, measuring, measuring, counting. I think in order to understand this timing adjustment interval, you have to realize what we're trying to measure. You have a line terminating unit, which is receiving bits of data at the speed of light. It's receiving approximately 8,000 frames a second. Each of those frames is constituted of 128 channels. Each channel is constituted of 64,000 bits. In some, one or more of those 64,000 bits, there are these timing adjustment intervals. You have to measure them in real time. There's simply no disclosure for how you would go about doing that or what structure is set forth for doing that. The only place that Collins points to is column 8, line 18 to line 39. There's absolutely no mention of measuring explicitly or implicitly of the timing adjustment interval in that section. Their own expert, Dr. Grover, never opines on this issue in his expert report or in his deposition. The only thing we have is Collins' attorney argument of how this thing works. Can you say there's no expert testimony that would say that counting is the same as measuring to one of ordinary skill in the art? That's correct, Your Honor. If there had been such evidence? If there had been such evidence that one of ordinary skill in the art when reading this patent and said, oh, it means for measuring that, he's counting something. Well, he'd have to be counting bits associated with the adjustment interval, not just counting anything. And that's not disclosed in that. It just seems hard to believe that somebody writes a patent in this very technical field and they use a means plus function language and don't put any structure in the spec or associating with the means for measuring. Well, it's not so surprising. What would be the structure in this patent? If you had written this patent and you wrote in means for measuring, what would you have put in the spec to support the means language? Well, according to our expert, this device wouldn't work. It's not enabled. You can't measure these timing adjustment intervals coming in at the speed of light in real time in this simplistic fashion. And the expert put forth, Dr. Birch, in his expert report, he didn't think this was enabled. There's no structure disclosed and their expert never responded. So I think the short answer is I don't believe that you could put in a structure in accordance with the protocol that's set forth in the patent. Thank you, Mr. Pruitt. Thank you. How much do you owe? Three minutes. Thank you, Your Honor. The point I want to emphasize on rebuttal is that even if this court affirms the district court's ruling on the meaning of randomly, the case still has to go back down to allow us to present evidence of infringement under that limitation. Rule 56C was violated here, and that alone warrants a remand of this matter. Mr. Floyd says, well, Do you feel that you weren't on notice at all as to the literal infringement of the random limitation? That's correct, Your Honor. If we look at the very pleading that Mr. Floyd talked about at page 7496, we see the particular limitations that they were moving on, and there were nine of them. Randomly isn't among them. It's numbers one through nine in the last paragraph of page 7496. Then we look at the particular passage that Mr. Floyd referred us to at pages 7503 and 7504. Those passages come under the general heading point B. The TST switch limitation in both patents is, again, not met by AACI. So that argument that Mr. Floyd pointed you to was, in fact, in connection with Southwestern Bell's claim that the TST switch wasn't present, not that randomly wasn't present. And, in fact, if we look carefully at what Mr. Floyd refers us to at 7503 and 004, that's talking about Arthur Collins' characterization of the randomly limitation in the patent. In other words, this is a challenge, again, to Collins' construction of that term, not whether there was evidence of infringement or not, under the district court's ultimate construction of that limitation. For literal infringement. For literal infringement or under the doctrine of equivalence, Your Honor. That's what I wanted to ask, because your adversary's point of view was that he felt, although we pushed in the corner on DOE and really couldn't find a prosecution history to estoppel Taproot, if you will, in the SJ motion, he did point to this 7503 language and say, oh, you knew about the random limitation, literally. We knew about the dispute about how that limitation should be construed. That is absolutely true. But because Southwestern Bell didn't move on that limitation per se, Southwestern Bell says, well, you should have dumped in all your infringement evidence anyway, irrespective of how we teed up the issue for summary judgment. And what that basically puts the patentee into the position of having to do is every time there's any summary judgment at all on any issue, you had better put in all your infringement evidence on every limitation. Otherwise, you stand to be challenged on the very same waiver argument that Southwestern Bell is arguing today. They simply didn't move on it. We didn't have an opportunity to put in this evidence. And so consequently, we were denied the procedural safeguards, which is the precise purpose that we have Rule 56C in the first place. Lastly on this issue, however, I want to point out that the 907 patent does not have this random limitation in it. So again, even if this court affirms the district court's ruling on randomly, that doesn't affect what ultimately happens on the 907 patent, albeit that there are two issues on appeal on that patent as well. With regard to- So that if the trial court was correct on the indefinite ruling, then the entire 907 goes down in total. That's correct, Your Honor. I would just say very, very briefly, however, that Mr. Floyd wants to shift the burden. He says there was no evidence from us about the definiteness of the counting means limitation in- measuring means limitation in the 907 patent. Really, the burden is on them. It should be clear and convincing evidence. The judge cites no evidence other than, again, attorney argument from Southwestern Bell. In her claim construction- On the other hand, if Bell comes forward and says, I've read the patent and I see absolutely no structure in the spec to mate with the means for measuring, and they make that assertion, they pass Rule 11 on the pleading, then isn't that their assertion that there is no structure? Doesn't that shift the burden to you to come in and show some structure? You're right, Your Honor, but in that circumstance, attorney argument should be just fine because what's good for the goose is good for the gander. If Southwest Bell says, we've read it, we don't understand it, it should be perfectly fine for Collins, in a similar fashion, to say, well, we have read it, we understand it, and here is where the corresponding structure is. Southwest Bell says, well, you should have had more stuff. You should have had an expert. You should have had documents. You should have had something. When Southwest Bell itself, at least, again, at the claim construction stage, didn't see fit to do that on its own, even though it had the burden. Thank you, Your Honor. Bloomfield, thank you. Case is submitted. All rise.